[Civil No. 4357.   Filed April 28, 1941.]

[112 Pac. (2d) 864.]

In the Matter of WILLIAM J. FELLOWS, a Member of the State Bar.

(No appearance for State Bar.)

Mr. William J. Fellows, Respondent, *in propria persona*.

ROSS, J.—This proceeding was commenced by the integrated bar of the state through its committees and Board of Governors to discipline William J. Fellows, a resident of Phoenix and a member of such bar, upon the following charges:

(1) For failure to appear and defend E. F. Patterson, charged with perjury in the Superior Court of Yavapai County, on June 2, 1938, after accepting employment and receiving a fee therefor; (2) for failure to file or prosecute an action for divorce for one Rosa Portugal after accepting from her his fee for so doing; and (3) for neglecting to attend to the probation of the estate of Sara Lugo, deceased, after having received payment of his fee therefor, necessitating the employment by the estate of another attorney to perform such services.

The respondent practically admits all of the charges but undertakes to explain them away. Take, for instance, the Patterson case. He admits the employment and that he had received a portion of his fee; admits being informed by Patterson's wife and by the judge of the Superior Court of Yavapai County that the case was set down for trial June 2, 1938, and that he fully intended, as he had promised, to go to Prescott for the trial, leaving Phoenix on the 1st of June. He explained that he did not go to Prescott for the following reason: He says that on June 1st, at about noon, he went to the stage office in Phoenix to buy transportation to Prescott and as he started towards the office a man inquired if he was Billy Fellows, to which he answered "yes." He was then told the man

in the automobile wanted to talk to him about a friend who was in trouble. He left his suitcase at the entrance to the Greyhound stage office and when he got to the automobile and was talking to the occupant the other man came up with his suitcase. The friend was in jail, he was first told. Instead of going to the jail, however, they drove around town and then told him there was no one in jail; said they were taking him for "a friendly ride" and that he "would either go along or else they would visit Brill Street." They headed for Nogales. Somewhere along the road he says he strewed "a lot of receipts and things" that contained his name; that he slipped these out of his pocketbook; that about sundown they were between Tucson and Nogales; that between Tubac and Nogales they went off the road and waited until early the following morning (June 2d); that when they got to Nogales he went, under instructions from the kidnapers, to the Mexican consul's office and procured a tourist passport; that they then took him to Santa Ana, Sonora, Mexico, and told him he was free but that he should stay there for at least ten days and not communicate with anybody in Arizona. He says he stopped at Hotel Gonzales until the morning of June 8th but did not register; that he then went further south, to Trincheras, and stopped with Rafael Mendoval and family until June 12th, when he left for home, arriving in Phoenix on June 14th.

On his cross-examination he said the kidnapers made no threats against him but against his baby at 1231 East Brill Street; that they intimated they would kidnap the baby. He said these men offered him money and were very kind to him; that he knew one of them and had seen him on numerous occasions. He could not give the license number on the automobile although he was in and out of the car frequently when it would stop for lunch or gasoline, and was in

position to observe the license number. He made no effort to get such number. Said the color of the car was light blue and he thought it was a Chevrolet; did not learn the names of the men; said they were Anglo-Saxons. When asked if he had put into his suitcase any of the files of the Patterson case, he said he had not. He explained that, however, by saying it was his purpose, after learning when the stage left for Prescott, to go to his office and remain until time for its departure.

The only reason he could assign for being kidnaped and taken into Mexico for ten days was that some foe or former client or some person, for one reason or another, wanted him away from Arizona for that length of time.

■ In corroboration of respondent's remarkable story of kidnaping, he offered what purports to be a certified copy of an affidavit of Alfonso Barce, of Mexico, in which the affiant states that on June 3, 1938, he saw attorney "J. Fellows" and two North Americans on the streets of Santa Ana and that he heard one of the men tell Fellows to remain in Mexico not less than ten days; that affiant took Fellows to the Hotel Gonzales and that later he directed him to Trincheras, and on June 13th conducted him to Nogales, etc. This instrument was dated November 15, 1940, and is certified to by the Municipal Judge of Santa Ana. Its contents, of course, was no evidence. It was merely hearsay. It has no evidentiary value. It was not a deposition taken with notice to the adversary party.

■ His story, then, stands alone, unsupported. It needs no analysis to show its improbability. In the first place, respondent's baby was not at Brill Street when this happened; in the second place, the baby was with its mother, who was not then living with respondent; in the third place, his explanation of the reason

for his being kidnaped for ten days is no reason at all; and finally, if he had been kidnaped, his experience as a criminal lawyer would have caused him not only to strew receipts and other papers with his name on them but to make observation as to the license number of the car, the names, business, etc., of his friendly kidnapers. Besides, if he had intended to go to Prescott to meet his engagements he would not have gone to the stage office with his suitcase without the files in the Patterson case. His statement that he had strewn along the road "a lot of receipts and things" with his name on them would indicate that he wanted to inform the world that he was in trouble and seeking help and yet when he was afforded every opportunity to escape from his captors he failed to do so. He was a willing prisoner for the sake of his baby and at the same time was signaling to the public to rescue him, if he is to be believed. His kidnap story, if true, would be a good excuse for his not keeping his engagement to go to Prescott in the discharge of his duty to his client, but such story is, without doubt, a mere fabrication. It is possible he was in Mexico on June 2d, as he relates, but we do not believe he was there for the reasons he gives.

The evidence concerning the Portugal divorce case is to the effect that Rosa Portugal employed respondent on June 15, 1937, to secure for her a divorce for an agreed fee of $45; that on that date she paid him $20; on July 10, $10; on July 24, 1937, $5; on the —— day of —— $5; and on April 12, 1940, the last payment. It was admitted by Portugal that respondent was not to get the divorce until she "had finished paying for it." When, on July 9, 1940, Portugal made her complaint against respondent to the Secretary of the State Bar, almost three months had elapsed since her final payment on the fee. On October 12, 1940, respondent admitted to the local administrative com-

mittee that the only thing he had done towards instituting the action for divorce was to secure from Rosa Portugal's husband a waiver of service of process, which was obtained about August 3, 1940. Respondent's explanation of the delay is that he could not locate the husband and could not, therefore, obtain service of process. If this excuse is accepted as true, it does not account for the total failure to file an action for divorce for four months after his fee had been paid in full.

In the Lugo case, the respondent's conduct, to say the least, was not of the high professional standard expected of the members of the bar. It is not necessary that we state in what respects his conduct was questionable in that case since enough has been related to show respondent to be unfit to practice law.

We can conceive of no act by an attorney more reprehensible than to desert, at the very hour set for his trial, a poor fellow charged with a felonious crime. Under the Canons of Professional Ethics of the State Bar of Arizona

"The right of an attorney or counsel to withdraw from employment, once assumed, arises only from good cause. Even the desire or consent of the client is not always sufficient. The lawyer should not throw up the unfinished task to the detriment of his client except for reasons of honor or self-respect. . . . Upon withdrawing from a case after a retainer has been paid, the attorney should refund such part of the retainer as has not been clearly earned." Canon 44.

Respondent not only failed in his duty to the court and his client by his absence from court on June 2d, when the case of the State of Arizona against Patterson was called for trial, but he has not refunded to Patterson, nor offered to refund to him, the money paid him as a fee.

We think his conduct calls for a judgment of disbarment, which is hereby ordered to be entered against him.

LOCKWOOD, C. J., and McALISTER, J., concur.